HAWLEY & LETZERICH v. UNITED STATES (No. 983).[1]

CREOSOTE OIL, WHAT NOT.

In paragraph 536, tariff act of 1909, it was the evident intention to restrict the grade of oil admissible free of duty under that paragraph to that known as dead oil. It is not shown here that the importation is in any sense dead oil; the record shows, on the contrary, that the importation was not at the date of the enactment of the tariff act of 1909 known as creosote oil, but was in fact an oil of much greater value.

United States Court of Customs Appeals, May 26, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7378 (T. D. 32653).

[Affirmed.]

*Comstock & Washburn* for appellants.

*William L. Wemple*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The merchandise involved in this case consists of a product of coal tar known under the trade name of "Carbolineum America." It was returned by the appraiser as a coal-tar preparation and assessed for duty under paragraph 15 of the tariff act of 1909 as the product of "coal tar, not colors or dyes and not medicinal, not specially provided for in this section."

---

[1] Reported in T. D. 33487 (24 Treas. Dec., 886).

The protest claimed, and the importers here claim, that the merchandise was entitled to free entry under paragraph 536 of the act, the applicable provision of which reads:

Products of coal tar known as dead or creosote oil.

On the hearing before the board testimony of a number of witnesses was taken on each side relating to the question of whether oil such as that in question in this case is commercially known as creosote oil. The board found that the proof did not sustain the claim of the importers. It also found, what appears to be the undisputed fact, that during the entire life of the tariff act of 1897, under a previous provision reading the same as that in the act in question, similar oils which have been imported into the United States have constantly paid the duty and no question has ever been raised against the payment. This fact was given by the board and is entitled to have some weight in determining· what was in the mind of Congress by the enactment of the provision in 1909.

The claim of the witnesses produced by the importer is that the term "creosote" as now commercially used is applied to any distillate of coal tar which contains phenol, no matter what its density. It is conceded that in the early days of creosote manufacture coal tar was distilled so as to obtain a light creosote, as some of the higher products were of greater value for other purposes than for those uses to which creosote was put. But it is said by one of the witnesses of the importers that as these high boiling products became of less value they were added to creosote distillates and not separated, thus producing a creosote of greater density than that originally produced. The exact period at which such change in the application of the term occurred is not made altogether clear by the testimony. One of the witnesses of the importer stated in one place that the change requiring greater specific gravity and a higher boiling point had occurred "two or three years ago," the testimony having been taken October 11, 1911. In another place he fixed the time as "three years ago."

The Government's witnesses, on the other hand, testify that creosote oil is now what it formerly was, and that if in making specifications for use of the product of coal oil a higher and more expensive oil than that which has been known as creosote oil is provided, this does not constitute the product, so required for use for such specifications, creosote oil, but something else. It is undoubtedly·true that to a large extent the judgment of some of the witnesses for the importer is based upon the fact that by specifications made by consulting engineers requiring greater specific gravity and a higher boiling point, the material which is now employed in some of the uses to which creosote oil has been devoted, particularly as a wood preservative, includes oils such as are here involved, and it is concluded from this that the nomenclature should follow the use and that these oils should still be called creosote.

The burden, of course, rested upon the importer to bring the importation within the meaning of the act of Congress at the time of its enactment. It would not be open to the importers of this product to extend the meaning of the term by their own act and in their own interests.

We think we find intrinsic evidence which indicates the sense in which the term "creosote oil" is used. It appeared by the testimony of some of the witnesses in the case that the terms "creosote oil" and "dead oil" are synonymous. This is entirely consistent with the claim of the Government's witnesses, as their testimony tends to show that high-boiling oils are not creosote oil within any proper meaning of that term. But it is significant that Mr. Richardson, a witness for the importers, who testified at great length as to the present uses of the oils in question, showing that they are devoted to the same uses that creosote oil formerly was, but stating that they are of a higher grade, was asked this question:

Q. What is the range of specific gravity in creosote oil?—A. They range from 1.02 up to 1.14.

By General Appraiser SHARRETTS:

Q. Your answers in regard to creosote oil apply equally to the substance known as dead oil?—A. Dead oil; one class of creosotes would be regarded as dead oil—that is to say, the more volatile portion of creosote.

Q. What would be the maximum and minimum point of boiling at which the dead oil would come off?—A. The temperature?

Q. Yes, sir.—A. Dead oil would come off at different points in different distilleries, with different varieties.

Q. The maximum and minimum?—A. Probably from—Oh, slightly over 100° C. up to 200° C. Oh, that is dead oil?

Q. I am speaking of dead oil.—A. From 150 to 235.

It would seem, therefore, that the change in nomenclature has not extended itself so as to apply the term "dead oils" to high-boiling oils, and that according to this witness dead oils would come off at a much lower boiling point than the oil in question.

We have no doubt that the terms "dead oil" and "creosote oil" are used as synonymous and as meaning the same thing in paragraph 536. That is the grammatical construction of the language, and if it be true that there are different grades of oil to which the term "creosote" is applied, the evident intention of Congress was to restrict the grade of oil admissible under paragraph 536 to that known as dead oil; and we are convinced that in any view that we may take of the testimony the burden of showing that the oil in question is in any proper sense known as a dead oil has not been met, and we are also of the opinion that the board had ample justification in the record for finding that the oil in question was not, at the time of the enactment of the tariff act of 1909, known as creosote oil, but was, in fact, an oil of much greater value.

The decision of the board is *affirmed*.